# United States Bankruptcy Appellate Panel

## For the Eighth Circuit

_____

No. 25-6010

_____

In re: Kevin P. Dandurand

Debtor

------------------------------

Kanyon Holdings, LLC

Creditor - Appellant

v.

Kevin P. Dandurand

Debtor - Appellee

_____

Appeal from United States Bankruptcy Court
for the District of South Dakota

_____

Submitted: May 21, 2026
Filed: August 10, 2026

_____

Before SURRATT-STATES, FENIMORE, AND CLAIR, Bankruptcy Judges.

_____

FENIMORE, Bankruptcy Judge.

Appellant Kanyon Holdings, LLC appeals the bankruptcy court's[1] orders (1) granting Appellee Kevin Dandurand's motion to reject a stock purchase agreement with Kanyon and (2) denying Kanyon's motion for relief from the automatic stay. Dandurand asks the panel to dismiss this appeal due to postappeal events that he asserts both eliminated Kanyon's appellate standing and rendered this appeal moot. For the following reasons, we deny Dandurand's motion to dismiss and affirm the bankruptcy court's orders on the merits.

## BACKGROUND

This appeal continues Kanyon's pre-bankruptcy effort to obtain a controlling interest in Dandurand's wholly owned snack food production corporation,[2] Dakota Style Foods, Inc. (DSF). Dandurand purchased DSF in 1998[3] and operated it profitably for almost twenty years.[4] Kanyon and its parent company run a private equity firm that invests primarily in real estate and operating businesses.[5]

In early 2023, Kanyon's CEO, Payton Smith, mailed Dandurand two letters to communicate Kanyon's interest in purchasing DSF.[6] After some exploratory meetings and discussions,[7] Dandurand's desire to sell DSF to Kanyon became

---

[1]The Honorable Laura L. Kulm Ask, Chief Bankruptcy Judge, United States Bankruptcy Court for the District of South Dakota.

[2]Tr. Mar. 27, 2025, Evidentiary Hr'g 10:7–9, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. June 15, 2025), Dkt. No. 217 [hereinafter Hr'g Tr.].

[3]Hr'g Tr. 51:12–13.

[4]*See* Hr'g Tr. 53:10–20 (discussing DSF's growth).

[5]Hr'g Tr. 157:23–158:2.

[6]Hr'g Tr. 13:11–20, 158:5–12.

[7]Hr'g Tr. 14:3–15:21.

urgent.[8]   Among other financial pressures,[9] DSF's sunflower seed supplier, Advanced Sunflower, was threatening to withhold shipments until DSF reduced the balance it owed to Advanced Sunflower.[10]  Motivated by the need to pay Advanced Sunflower and other vendors as soon as possible, Dandurand pressed Kanyon to hasten the transaction.[11]

In apparent response to Dandurand's pressure,[12] Smith emailed a DSF representative to suggest a "total buyout" for $1.037 million.[13]  Dandurand's team counteroffered with $1.7 million.[14]  Smith quickly responded that Kanyon "[didn't] see the possibility of any cash changing hands now," but if Dandurand agreed to sell DSF to Kanyon for $1.00, and other events occurred, Kanyon "would exercise [its] option buying the shares, and inject the required capital into the business."[15] Dandurand testified that the parties had multiple phone calls after Smith's email, during which "Smith made several commitments to [Dandurand]" concerning DSF's debts to its vendors.[16]  At the conclusion of those phone calls, Dandurand signed a

[8]Hr'g Tr. 16:2–5.

[9]Hr'g Tr. 59:14–60:3.

[10]Hr'g Tr. 16:2–17:16, 60:21–62:15.

[11]Hr'g Tr. 16:2–17:16, 63:2–5.

[12]Hr'g Tr. 63:15–21 (testifying about communications during "brief meeting" following April 19 facility tour), 66:12–21 (describing Smith's April 19 offer).

[13]April 20, 2023, 11:03 a.m. Email String Payton Smith to Kevin Dandurand et al. (State Ct. Bates ID Kanyon 000099) Ex. D1, at 2, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Apr. 10, 2025), Dkt. No. 163 [hereinafter Apr. 20 Email String]; Hr'g Tr. 66:12–21.

[14]Apr. 20 Email String, at 1; Hr'g Tr. 67:7–17.

[15]Apr. 20 Email String, at 1; Hr'g Tr. 67:24–68:16.

[16]Hr'g Tr. 69:8–16, 77:12–78:3.

Stock Purchase Agreement (SPA),[17] agreeing to sell 90% of his interest in DSF to Kanyon at closing, to refrain from competing with DSF or soliciting any DSF employees for two years from the date of closing, and to fulfill other substantial obligations before and after closing.[18]

Though the parties agree that the SPA imposed substantial obligations on Dandurand,[19] they disagree about the scope of Kanyon's obligations under the SPA. Dandurand argues that Kanyon agreed to fulfill obligations beyond paying $1.00 in exchange for 90% of Dandurand's shares in DSF, including paying Advanced Sunflower and other DSF vendors. Kanyon, in contrast, maintains that its only obligation was to pay the $1.00 purchase price. Though certain covenants in the SPA are ambiguous, the agreement does not facially require Kanyon to comply with the additional obligations Dandurand identifies.

Almost immediately after the parties signed the SPA, Dandurand began pressuring Kanyon to fulfill its alleged preclosing commitments, including paying

---

[17]Hr'g Tr. 69:5–7.

[18]*See* Stock Purchase Agreement Ex. K6, at 1, 5, 16–20, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Apr. 10, 2025), Dkt. No. 163 [hereinafter Stock Purchase Agreement] (imposing various obligations on Dandurand as seller).

[19]Appellant's Principal Br. 46 ("[A]s of the petition date, the only performance remaining under the SPA was on [Dandurand's] side."); Appellee's Principal Br. 25 ("The lower court properly found that the [SPA] was executory because there were unperformed duties on both sides . . . .").

DSF's vendors[20] and taking other preclosing steps.[21]  When Kanyon declined to make preclosing payments, Dandurand attempted to rescind.[22]  Kanyon resisted.[23]

Counsel for Dandurand then received a letter from Kanyon stating that closing would occur more than two months earlier than the originally scheduled closing date.[24]  The letter also waived all the conditions to Kanyon's obligation to close.[25]

---

[20]*See, e.g.*, Hr'g Tr. 77:21–78:3 ("Are you paying Advanced Sunflower? . . . [H]is response was, we're working on it . . . . And I said . . . that wasn't the agreement. The agreement was you were going to pay Advanced Sunflower seed."); April 24, 2023, 18:32 Email String Kevin Dandurand to Payton Smith et al. (State Ct. Bates ID Kanyon 000039) Ex. D3, at 1, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Apr. 10, 2025), Dkt. No. 163 [hereinafter Apr. 24 Email String] ("If we can't get the film company [$]208k to loosen them up the plant will shut down completely by the latest next week.").

[21]April 27, 2023, 22:45 Email String Kevin Dandurand to Jared Gass et al. (State Ct. Bates ID 000027) Ex. D4, at 1, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Apr. 10, 2025), Dkt. No. 163 ("I would like to have in writing exact detail on how you plan to invest funds into the company. What happens if the real estate plan doesn't work out . . . ? Also your plan to pay my personal company loans as well as buy out my interest. Employee plans for healthcare and equity, etc. Employment contracts for key personnel . . . .").

[22]Hr'g Tr. 77:14–78:12.

[23]Hr'g Tr. 78:11–79:23.

[24]May 3, 2023, Letter to Zach Crane Re: Waiver Conditions Close Ex. K9, at 1, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Apr. 10, 2025), Dkt. No. 163 [hereinafter Waiver Letter].

[25]Waiver Letter, at 1.

Kanyon appeared at closing "ready, willing and able to close the transaction,"[26] but Dandurand did not appear.[27] Closing never occurred.[28]

Shortly thereafter, Kanyon served Dandurand with a state court lawsuit,[29] seeking specific performance of the SPA, damages for Dandurand's alleged breach of the agreement, and other relief.[30] Dandurand answered, counterclaimed, and filed motions to dismiss that the state court subsequently denied.[31] Dandurand's state-court counsel estimated that the parties accomplished approximately "30 percent of the work" necessary to complete the state-court litigation.[32]

Meanwhile, Dandurand's personal finances were deteriorating. He had already spent more than $200,000 to litigate against Kanyon,[33] with an additional $400,000 to $500,000 in legal fees looming.[34] He cut his personal salary in half,[35] and then completely stopped taking a salary.[36] He used personal credit cards to keep

---

[26]Hr'g Tr. 168:17–169:7.

[27]Hr'g Tr. 115:11–13.

[28]*See* Hr'g Tr. 87:19–20 ("I wasn't going to close.").

[29]Hr'g Tr. 125:2–9.

[30]Am. State Ct. Compl. Ex. D13, at 16–18, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Apr. 10, 2025), Dkt. No. 163 [hereinafter State Ct. Compl.].

[31]Hr'g Tr. 20:5–21:1.

[32]Hr'g Tr. 141:2–6.

[33]Hr'g Tr. 95:2–6.

[34]Hr'g Tr. 141:22–24.

[35]Hr'g Tr. 41:14–20, 92:4–5.

[36]Hr'g Tr. 96:19–97:2.

DSF afloat[37] and incurred new debt to pay existing debts.[38] He began paying only the minimum balances due on his credit cards.[39] Though Dandurand met with bankruptcy counsel in mid-2023, he did not file a bankruptcy petition at that time.[40]

By December 2024, however, Dandurand realized he needed to "bring an end" to the state-court litigation and his financial deterioration.[41] To that end, Dandurand offered Kanyon $100,000 to settle the litigation and said he would seek bankruptcy protection if Kanyon did not accept the offer.[42] Kanyon rejected Dandurand's offer.[43]

The day after Kanyon rejected his settlement offer, Dandurand commenced his bankruptcy case, electing to proceed under subchapter V of chapter 11.[44] Dandurand testified that he sought bankruptcy relief to gain control of his personal finances, reject the SPA, and reduce legal costs, among other reasons.[45]

---

[37]Hr'g Tr. 99:5–15.

[38]Hr'g Tr. 30:14–32:6, 35:13–37:6, 37:16–21, 90:24–91:1.

[39]Hr'g Tr. 92:10–21.

[40]Hr'g Tr. 90:2–8.

[41]Hr'g Tr. 24:16–25.

[42]Email String Dated December 6–8, 2024, Between Joe Erickson & Stan Siegel Ex. K5, at 2, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Apr. 10, 2025), Dkt. No. 163 [hereinafter Dec. 6–8 Email String].

[43]Dec. 6–8 Email String, at 1.

[44]Chapter 11 Voluntary Pet. Individuals, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Dec. 9, 2024), Dkt. No. 1.

[45]*See* Hr'g Tr. 90:24–92:21 (discussing "borrowing credit to pay credit," cost and duration of litigation, and payment of only minimum balances on credit cards).

Kanyon quickly moved for relief from the automatic stay, seeking authority to continue the state-court litigation,[46] and later filed a motion to dismiss Dandurand's case.[47] Kanyon also filed a proof of claim for Dandurand's alleged breach of the SPA.[48] Dandurand then filed a motion to reject the SPA.[49] The bankruptcy court conducted combined hearings on Kanyon's motion for relief from the automatic stay, Kanyon's motion to dismiss, and Dandurand's motion to reject the SPA.[50]

The bankruptcy court subsequently entered an opinion[51] and orders (1) denying Kanyon's motion to dismiss Dandurand's bankruptcy case,[52] (2) granting

---

[46]Mot. Relief Automatic Stay, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Jan. 3, 2025), Dkt. No. 53.

[47]Mot. Dismiss Case, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Feb. 17, 2025), Dkt. No. 124.

[48]Proof Claim No. 14-1, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Feb. 10, 2025). The parties did not designate Kanyon's proof of claim as an item included in the record on appeal, but that claim's existence is relevant to this panel's analysis of Dandurand's motion to dismiss. Consequently, this panel orders that the record on appeal include Kanyon's proof of claim. *See* Fed. R. Bankr. P. 8009(a)(4) ("The record on appeal must include: . . . any other items from the record that the court where the appeal is pending orders to be included.").

[49]Mot. Reject Executory Contract, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Feb. 11, 2025), Dkt. No. 121.

[50]Hr'g Tr. 4:1.

[51]Decision Re: Kanyon Holdings, LLC's Mot. Dismiss; Debtor's Mot. Reject Executory Contract; Kanyon Holdings, LLC's Mot. Relief Automatic Stay, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. May 23, 2025), Dkt. No. 192 [hereinafter Op.].

[52]Order Denying Kanyon Holdings, LLC's Mot. Dismiss, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. May 23, 2025), Dkt. No. 193.

Dandurand's motion to reject the SPA,[53] and (3) denying Kanyon's motion for relief from the automatic stay.[54] Though the bankruptcy court authorized Dandurand to reject the SPA, the court did not set a deadline for Kanyon to file a proof of claim for contract rejection damages. This appeal of the bankruptcy court's orders approving contract rejection and denying stay relief followed.

At least two postappeal events arguably affect the issues on appeal and, therefore, merit additional elucidation: (1) Kanyon's withdrawal of its proof of claim and (2) confirmation of Dandurand's chapter 11 plan. Relying on these postappeal circumstances, Dandurand now asks this panel to dismiss this appeal as moot and for lack of standing.

The first relevant postappeal circumstance is Kanyon's withdrawal of its proof of claim.[55] After initiating this appeal, Kanyon sought[56] and received approval[57] to withdraw its proof of claim for breach of the SPA. Kanyon's stated "[g]ood cause" for the withdrawal was "avoid[ing] litigation expense for the estate and Kanyon."[58] Nothing in the record reflects that Kanyon filed a new claim for contract rejection damages or that the bankruptcy court set a deadline for Kanyon to file that type of claim.

---

[53]Order Granting Debtor's Mot. Reject Executory Contract, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. May 23, 2025), Dkt. No. 194.

[54]Order Denying Kanyon Holdings, LLC's Mot. Relief Automatic Stay, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. May 23, 2025), Dkt. No. 195.

[55]Order Approving Kanyon Holdings, LLC's Mot. Withdraw Proof Claim 14, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Oct. 23, 2025), Dkt. No. 304.

[56]Mot. Authority Withdraw Proof Claim 14, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Oct. 15, 2025), Dkt. No. 294.

[57]Order Approving Kanyon Holdings, LLC's Mot. Withdraw Proof Claim 14.

[58]Mot. Authority Withdraw Proof Claim 14, at 1.

-9-

The second relevant postappeal event is confirmation of Dandurand's chapter 11 plan. Dandurand filed his chapter 11 plan before the bankruptcy court held its combined hearing and entered the opinion and orders now on appeal.[59] That plan stated that Dandurand would reject the SPA[60] and provided viable paths to reorganization no matter how the bankruptcy court ruled on contract rejection and stay relief. Specifically, the plan provided alternative treatment for Kanyon's claim: if the bankruptcy court granted the rejection motion, then claim valuation would follow, but if the bankruptcy court denied the rejection motion, then Dandurand would file an adversary proceeding against Kanyon to avoid the SPA as a "voidable transfer" and seek claim valuation.[61]

Dandurand did not change Kanyon's treatment under the plan after the bankruptcy court granted Dandurand's rejection motion and denied Kanyon's motion for stay relief.[62] And though Kanyon originally objected to confirmation,[63] it ultimately withdrew its objection[64] and, with court approval, ballot rejecting Dandurand's plan.[65] Consequently, after Kanyon took this appeal, the bankruptcy

[59]*See* Debtor's Plan Dated March 10, 2025, Ex. K13, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Apr. 10, 2025), Dkt. No. 163 [hereinafter Mar. 2025 Plan].

[60]Mar. 2025 Plan, at 2, 9, 11–13.

[61]Mar. 2025 Plan, at 2.

[62]*Compare* Mar. 2025 Plan, at 2, 8, 10 (describing valuation of Kanyon's claim after rejection or at conclusion of avoidance action) *with* Plan as Confirmed, at 2, 7–8, 10, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Nov. 13, 2025), Dkt. No. 317 (same).

[63]Obj. Confirmation Plan, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Apr. 14, 2025), Dkt. No. 170.

[64]Withdrawal, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Oct. 15, 2025), Dkt. No. 288.

court confirmed Dandurand's plan with only minor amendments unrelated to Kanyon and the substantive issues before this panel.[66] The confirmed plan retains the preappeal language providing alternatives for treating Kanyon's claim.[67]

Dandurand premises his motion to dismiss on these postappeal events. This panel analyzes both the motion to dismiss and the merits of this appeal below.

## DISCUSSION

### I. We deny Dandurand's motion to dismiss because no postappeal events relieve us of our obligation to hear and decide this appeal.

As a preliminary matter, Dandurand asks us to dismiss this appeal without reaching the merits, arguing that Kanyon's postappeal withdrawal of its proof of claim and the confirmation of Dandurand's plan "had the effect of erasing Kanyon Holdings' standing . . . while also mooting the instant appeal."[68] We determine that the circumstances Dandurand raises do not relieve us of our "virtually unflagging" obligation to decide this appeal. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–28 (2014) (criticizing prudential barriers to judicial review). Consequently, we deny Dandurand's motion to dismiss on both grounds.

#### A. Kanyon retains standing to pursue this appeal.

As his first basis for dismissal, Dandurand argues that plan confirmation and Kanyon's withdrawal of its proof of claim "eras[ed] Kanyon Holdings' standing"[69]

---

[65]Hr'g Mins. Re: Obj. Claim, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Oct. 23, 2025), Dkt. No. 305.

[66]Order Confirming Plan, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Nov. 13, 2025), Dkt. No. 316.

[67]Plan as Confirmed, at 2, 7–8, 10.

[68]Appellee's Mot. Dismiss 5.

to litigate this appeal under the Eighth Circuit's "person aggrieved" doctrine.[69] We reject this basis for dismissal.

Though Dandurand appears to rely primarily on the person aggrieved doctrine, his arguments concerning standing also implicate Article III of the United States Constitution.[70] Accordingly, we begin by assessing Kanyon's standing under Article III's applicable framework. Article III's standing requirement is a jurisdictional limit to federal review that contains three elements: (1) injury in fact; (2) causation; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Muff v. Wells Fargo Bank NA*, 71 F.4th 1094, 1100 (8th Cir. 2023). As to the first element, the bankruptcy court's decisions injure Kanyon by altering its contractual rights, including its right to an investment opportunity under the SPA and its right to seek specific performance in a nonbankruptcy court. These injuries are concrete, particularized, and actual deprivations of Kanyon's rights, and they give Kanyon a direct stake in the outcome of this appeal. Kanyon's injuries, therefore, satisfy the first element of Article III standing. Kanyon's injuries also satisfy the second element, causation, because those injuries directly result from the bankruptcy court's orders permitting contract rejection and denying Kanyon stay relief. Finally, under the third element, reversal on appeal would redress Kanyon's injuries by restoring its rights to seek specific performance and pursue its desired investment opportunity. Thus, Kanyon has Article III standing to pursue this appeal on its merits, and we retain jurisdiction to hear this appeal on that basis.

We also retain authority to hear this appeal under the Eighth Circuit's person aggrieved doctrine.

Though courts often describe the person aggrieved doctrine as one of appellate standing in bankruptcy, *Peoples v. Radloff (In re Peoples)*, 764 F.3d 817, 820 (8th Cir. 2014), the doctrine is narrower and more restrictive than the traditional test governing constitutional standing under Article III. *Opportunity Fin., LLC v. Kelley*,

---

[69]Appellee's Mot. Dismiss 5.

[70]U.S. Const. art. III.

822 F.3d 451, 458 (8th Cir. 2016); *Mercy Health Network v. Mercy Hosp., Iowa City, IA*, 178 F.4th 449, 455–56 (8th Cir. 2026) (Stras, J., concurring). The person aggrieved doctrine functions as a prudential limit to bankruptcy appeals,[71] rather than as a barrier to jurisdiction, serving prudence by curtailing collateral attacks from bankruptcy participants who suffer only indirect injuries and who are not party to the dispute on appeal. *Wigley v. Wigley (In re Wigley)*, 886 F.3d 681, 684 (8th Cir. 2018). To achieve efficient judicial administration in bankruptcy, we limit appellate review to decisions that directly affect an appellant's interests. *Id.* (quoting *Travelers Ins. Co. v. H.K. Porter Co.*, 45 F.3d 737, 741 (3d Cir. 1995)).

As its name implies, the doctrine permits only persons aggrieved to appeal bankruptcy decisions. *Peoples*, 764 F.3d at 820. A person "directly and adversely affected pecuniarily by the order" on appeal is a person aggrieved. *Id.* (quoting *Sears v. U.S. Tr. (In re AFY)*, 734 F.3d 810, 819 (8th Cir. 2013)). An order sufficiently affects a person's pecuniary interests if the order injures the person's property or impairs the person's rights. *Opportunity Fin., LLC*, 822 F.3d at 458; *Williams v. Marlar (In re Marlar)*, 267 F.3d 749, 753 n.1 (8th Cir. 2001). The harmful pecuniary impact must be direct, real, and immediate—not remote or speculative. *Opportunity Fin., LLC*, 822 F.3d at 458; *Mercy Health Network*, 178 F.4th at 453.

---

[71]For the purposes of this appeal, we presume that the person aggrieved doctrine survives the Supreme Court's admonishment against prudential barriers to standing in *Lexmark* because the Eighth Circuit has continued to apply the doctrine after that ruling. *See, e.g.*, *Mercy Health Network*, 178 F.4th at 453 (applying the doctrine after *Lexmark* despite a concurring opinion spotlighting issues surrounding its continuing viability and utility). *But see Arlington Cap., LLC v. Bainton McCarthy LLC (In re GT Automation Grp., Inc.)*, 828 F.3d 602, 605 n.1 (7th Cir. 2016) (declining to "discuss whether, after *Lexmark*, the standing analysis in bankruptcy cases involves any 'prudential' considerations"); *Adams v. Roman Cath. Church of Archdiocese of New Orleans (In re Roman Cath. Church of Archdiocese of New Orleans)*, 101 F.4th 400, 408 (5th Cir. 2024) ("Indeed, this court's 'exacting' 'person aggrieved' test may be incompatible with the Supreme Court's decision in *Lexmark*, which cast doubt on the role of prudential standing rules in federal courts.").

Under this test, Kanyon is a person aggrieved and may pursue this appeal. The orders on appeal directly and adversely affect Kanyon's pecuniary rights by diminishing its property right to the DSF shares, impairing its right to pursue its investment opportunity, and preventing it from litigating its rights under the SPA in state court. Moreover, even if the DSF shares are currently worthless under certain valuation methods, the orders injure Kanyon's pecuniary interests because the impairment of Kanyon's investment opportunity injures its rights to pursue potential future monetary benefit. Specifically, the SPA gives Kanyon an interest in using DSF's assets and operations to maximize Kanyon's potential return on investment. Though Kanyon's pecuniary injury has not been liquidated because its investment has yet to come to fruition, Kanyon's loss of its investment opportunity clearly is pecuniary in nature. And because Kanyon's injuries stem directly from the bankruptcy court's orders and not a remote or speculative future proceeding, the orders' effects are sufficiently immediate to satisfy the person aggrieved doctrine. *Cf. Opportunity Fin., LLC*, 822 F.3d at 458–59 (concluding parties were not persons aggrieved because their potential injuries would stem from a separate, remote avoidance action involving factual and legal issues distinct from those asserted in pending appeal).

These direct pecuniary injuries survive plan confirmation and Kanyon's withdrawal of its proof of claim. As to Kanyon's withdrawal of its claim, we decline Dandurand's invitation to interpret the person aggrieved doctrine to extend appellate review only to parties holding valid proofs of claim; a prerequisite that restrictive contradicts the far-reaching ways bankruptcy decisions often affect non-creditors. *Cf. Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 281–82 (2024) (concluding that insurer was a party in interest entitled to object to a debtor's chapter 11 plan confirmation because the proposed plan affected the insurer pecuniarily). Moreover, even if the person aggrieved doctrine requires Kanyon to assert a claim against the bankruptcy estate, Kanyon's withdrawal of its claim did not destroy its appellate standing. The bankruptcy court retains discretion under Rules 3003(c)(3) and 3002(c)(4) to set a deadline for Kanyon to file a proof of claim following

-14-

rejection and, because the SPA's rejection remains pending on appeal,[72] that court has not yet set that deadline.

Similarly, plan confirmation did not divest Kanyon of any pecuniary interest in this appeal because the plan specifically contemplates alternative outcomes that each affect Kanyon's pecuniary rights. Under the confirmed plan, either Dandurand will successfully reject the SPA, and Kanyon may assert a claim against the estate for rejection damages, or Dandurand will not be permitted to reject the SPA, and he will instead attempt to avoid the SPA as a fraudulent transfer in a separate adversary proceeding.[73] Under this alternative structure, Kanyon's interest in opposing contract rejection and seeking stay relief remains intact. Consequently, the record does not support Dandurand's argument under the person aggrieved doctrine.

Because the postappeal events that Dandurand raises do not erase Kanyon's ongoing pecuniary injuries or its standing to pursue this appeal, we decline to dismiss on this ground.

## B. This appeal is not moot.

Dandurand next argues that plan confirmation and Kanyon's withdrawal of its proof of claim render this appeal constitutionally and equitably moot. For the following reasons, we disagree.

### 1. Constitutional mootness does not bar this appeal.

The doctrine of constitutional mootness derives from Article III's requirement that courts decide only live "cases and controversies" and deprives courts of jurisdiction to decide moot questions. *See Chafin v. Chafin*, 568 U.S. 165, 171–72

---

[72]*See* Fed. R. Bankr. P. 3003(c)(3) (authorizing court to permit contract rejection claim after claims bar date has expired in chapter 11 cases by reference to Rule 3002(c)(4)); Fed R. Bank. P. 3002(c)(4) (permitting a creditor to file a claim for contract rejection damages "within the time set by the court").

[73]Plan as Confirmed, at 2, 7–8, 10.

(2013).  The doctrine persists on appeal.  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 478–79 (1990).

The standard to hold an appeal constitutionally moot is demanding.  *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 377 (2019).  "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station Emps.*, 466 U.S. 435, 442 (1984) (citing *Powell v. McCormack*, 395 U.S. 486, 496–98 (1969)).  An appeal becomes moot only if intervening circumstances "make[] it impossible for the court to grant 'any effectual relief.'" *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green,* 159 U.S. 651, 653 (1895)).  A court should not dismiss an appeal as long as even a "partial remedy" is possible.  *Id.* at 13.

The present circumstances do not satisfy this demanding standard.  Kanyon has concrete interests in the outcome of this litigation because the decisions on appeal deprive Kanyon of its interest in the SPA, its opportunity to invest in DSF, and its ability to litigate its specific performance case.  Just as plan confirmation and Kanyon's withdrawal of its claim do not defeat bankruptcy appellate standing, those events also do not defeat Kanyon's interests in the outcome of this appeal.  Those events certainly do not make it impossible for us to grant any effective relief if we accept Kanyon's substantive arguments.  Thus, Kanyon's appeal is not constitutionally moot.

### 2. Equitable mootness does not require us to dismiss this appeal.

When constitutional mootness does not mandate dismissal, appellate courts in the Eighth Circuit may nonetheless dismiss a bankruptcy appeal if "common sense or equitable considerations" excuse appellate review.  *FishDish, LLP v. VeroBlue Farms USA, Inc. (In re VeroBlue Farms USA, Inc.)*, 6 F.4th 880, 888 (8th Cir. 2021) (quoting *Manges v. Seattle-First Nat'l Bank (In re Manges)*, 29 F.3d 1034, 1039 (5th Cir. 1994)).  Though courts traditionally referred to this bankruptcy-specific barrier to appellate review as "equitable mootness," the Eighth Circuit recently criticized

-16-

the doctrine and "banish[ed] 'equitable mootness' from the (local) lexicon." *Id.* at 888–89 (first quoting *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994), then citing *In re One2One Commc'ns, LLC*, 805 F.3d 428, 446–47 (3d Cir. 2015) (Krause, J., concurring)). Thus, a party requesting dismissal on this basis must pass a "rigorous test" to persuade the appellate court that "bankruptcy equities and pragmatics justify foregoing . . . judicial review." *Id.* at 883.

Though no specific standard governs our administration of this test, "[t]he most important factors are whether the confirmed plan [']has been substantially consummated and, if so, what effects reversal of the plan would likely have on third parties.'" *Id.* at 889 (quoting *Search Mkt. Direct, Inc. v. Jubber (In re Paige)*, 584 F.3d 1327, 1339 (10th Cir. 2009)).[74] It may be appropriate to forego judicial review after confirmation if "a party seeks appellate review of an issue that, if upset, would unduly disturb the plan," *Williams v. Citifinancial Mortg. Co. (In re Williams)*, 256 B.R. 885, 896 (B.A.P. 8th Cir. 2001), or if reversal would otherwise "creat[e] an unmanageable and uncontrollable situation." *Blackwell v. Little (In re Little)*, 253 B.R. 427, 431 (B.A.P. 8th Cir. 2000).

On this record, we conclude the "bankruptcy equities and pragmatics" do not pass the Eighth Circuit's "rigorous test" to excuse appellate review. *In re VeroBlue Farms USA, Inc.*, 6 F.4th at 883.

The confirmed plan explicitly proposed alternative paths for reorganization no matter how the bankruptcy court ruled on contract rejection and stay relief.[75] Those alternative paths alleviate any unfairness that third parties might have

---

[74]Though courts also consider whether the appellant obtained a stay pending appeal of the decision that allegedly renders the appeal moot, *In re VeroBlue Farms USA, Inc.*, 6 F.4th at 889, Kanyon's failure to seek a stay pending appeal is not critical to our inquiry here because the plan confirmation order that allegedly rendered this appeal moot is not subject to any appeal.

[75]Plan as Confirmed, at 2, 7–8, 10.

otherwise suffered and undermine Dandurand's arguments that this appeal would unduly disturb the plan and that equity weighs against appellate review.

Similarly, Kanyon's preconfirmation withdrawal of its prepetition claim is not inconsistent with the plan or Kanyon's ongoing pursuit of this appeal. The plan provides that Kanyon would have a claim for contract rejection damages if Dandurand prevails in this litigation, and applicable Rules give the bankruptcy court authority to impose a deadline after rejection.

Finally, Dandurand's argument that the plan's reliance on employment income "moots" the appeal proves too much. The Eighth Circuit's reluctance to invoke equitable mootness cautions against a rule that would entitle debtors to maintain their current employment merely by obtaining confirmation of wage-funded plans. Moreover, the record does not show that the difficulty Dandurand anticipates in obtaining alternative local employment or income sources would create a truly unmanageable or uncontrollable situation.

Consequently, we deny Kanyon's motion to dismiss this appeal as equitably moot. Having dispensed with the motion to dismiss, we turn to the merits of this appeal.

## II. We affirm the bankruptcy court's rulings on their merits.

Two competing stories and two competing motions lie at the heart of this appeal. Dandurand contends that Kanyon duped him into signing a potentially ruinous agreement that fails to specify Kanyon's true obligations.[76] Dandurand asked the bankruptcy court to free him from this agreement, and the bankruptcy court obliged. In contrast, Kanyon frames this matter as one of an altruistic private equity firm attempting to save a South Dakota snack food institution from financial collapse with $1.00, an unspecified investment strategy, and good intentions.[77] Kanyon

---

[76]Appellee's Principal Br. 21.

[77]*See, e.g.*, Hr'g Tr. 159:20–24 ("So we are interested in buying the company but we're not like profiteers where we're doing everything for money sake. And so

asked the bankruptcy court to let it pursue these intentions by continuing its pending state-court litigation against Dandurand, and the bankruptcy court declined.

On appeal, Kanyon challenges the merits of the bankruptcy court's decisions and two evidentiary rulings. Because we conclude the bankruptcy court did not commit reversible error—evidentiary or otherwise—we affirm.

## A. The bankruptcy court's evidentiary rulings do not require reversal.

We begin by resolving two evidentiary questions that Kanyon raises. First, did the bankruptcy court err in admitting and considering parol evidence to determine whether the SPA is an executory contract? And second, did the bankruptcy court commit reversible error by declining to give weight to Dandurand's settlement offer? For the following reasons, we conclude that the answer to both questions is no.

### 1. The bankruptcy court properly admitted and considered parol evidence of the SPA's terms.

Kanyon first argues that the bankruptcy court committed reversible error by admitting and considering parol evidence to determine the SPA's terms and conditions. The bankruptcy court applied South Dakota law and concluded, among other things, that certain provisions in the SPA render its conditions to closing ambiguous and permitted the court to admit parol evidence to construe those conditions, despite a merger clause stating that the SPA's language controls.[78]

---

like we've got settlement offers and different things and we've said from the very beginning we're not doing this for money."), 181:4–10 ("[O]ur intention with this whole deal was to help Kevin Dandurand out when he called us in need. . . . [Kanyon is still pursuing the deal] because we got more involved and now we have a vision for the company and we understand the struggles and we care about people and we want to save jobs in South Dakota.").

[78]*See* Op. 13–15.

Like the bankruptcy court, we determine that South Dakota law governs our analysis of the parol evidence rule. *See Severson v. Fleck*, 251 F.2d 920, 923 (8th Cir. 1958) (applying state law); *Finstad v. Gord (In re Finstad)*, 613 B.R. 180, 183 (B.A.P. 8th Cir. 2020) (rejecting appellants' argument that "the application of North Dakota's parol evidence rule is preempted by the United States Constitution's Supremacy Clause, the Bankruptcy Clause, and federal bankruptcy law"). Applying South Dakota law, we agree that (1) the SPA ambiguously describes the preconditions to its closing, (2) the conditions precedent exception to the parol evidence rule applies, and (3) the merger clause does not preclude the admission of parol evidence in these circumstances. Consequently, the bankruptcy court did not err.

Parol evidence, meaning evidence extrinsic to the four corners of a contract, generally is inadmissible to contradict a contract's written terms. *See* S.D. Codified Laws § 53-8-5. But a court may consult parol evidence when the contract language "is ambiguous[] and does not speak to a subject it would normally be expected to" address. *Sioux Steel Co. v. Ins. Co. of Pa.*, 127 F.4th 1113, 1118 (8th Cir. 2025) (quoting *AFSCME Loc. 1922 v. South Dakota*, 444 N.W.2d 10, 12 (S.D. 1989)). A contract's language is ambiguous if "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Brown v. Cont'l Res., Inc.*, 58 F.4th 1023, 1025 (8th Cir. 2023) (quoting *Vander Heide v. Boke Ranch, Inc.*, 736 N.W.2d 824, 836 (S.D. 2007)).

Here, ambiguities in the SPA open the door for parol evidence. Article II, Section 2.01 of the SPA contains an error message, setting closing to occur "after the last of the conditions to Closing set forth in **Error! Bookmark not defined.Error! Reference source not found.** [sic] have been satisfied or waived."[79] This language creates significant ambiguity because it invites multiple interpretations of the SPA. Kanyon posits that this language refers to Article VI of

---

[79]Stock Purchase Agreement, at 4.

the SPA, titled "Conditions to Closing."[80] But "a reasonably intelligent person who has examined the context of the entire integrated agreement" could interpret the language to refer to multiple sections of the SPA or even other, unspecified conditions. *Id.* As a result, this language creates significant ambiguity about the preconditions to closing the SPA's proposed transaction. Article VI of the SPA contains additional ambiguous language. That section of the SPA includes a requirement that "[Kanyon] shall be satisfied that its financing plan for [DSF] is executable"[81] before closing the SPA's proposed transaction. But the SPA never defines the "financing plan" or explains the extent of the parties' obligations under it. The bankruptcy court did not err in considering parol evidence to analyze these ambiguous, and essential, contract provisions.

Moreover, the conditions precedent exception to the parol evidence rule would permit the admission of extracontractual conditions to closing even if the referenced provisions of the SPA were unambiguous. Under this exception, parol evidence is admissible to establish that a condition is a necessary prerequisite to a party's performance. *See Auto-Owners Ins. Co. v. Hansen Hous., Inc.*, 604 N.W.2d 504, 509–10 (S.D. 2000). Here, parol evidence supports the bankruptcy court's conclusion that Dandurand had no obligation to sell 90% of his shares in DSF to Kanyon until Kanyon paid certain DSF vendors,[82] and, as a result, the relevant parol evidence is admissible. Thus, the bankruptcy court did not err in admitting and considering parol evidence to determine whether the SPA is an executory contract.

Finally, Kanyon's argument that the SPA's merger clause prevents admission of parol evidence fails. A merger clause, also known as an integration clause, states

---

[80]Stock Purchase Agreement, at 18–19.

[81]Stock Purchase Agreement, at 19.

[82]*See* discussion *infra* Section II.B.1; Hr'g Tr. 77:21–78:3 ("Are you paying Advanced Sunflower? . . . [H]is response was, we're working on it . . . . And I said . . . that wasn't the agreement. The agreement was you were going to pay Advanced Sunflower seed.").

-21-

that a contract's terms are the complete and final agreement between the parties, obviating the need to consult parol evidence. *See Merger Clause*, *Black's Law Dictionary* (12th ed. 2024) ("See INTEGRATION CLAUSE."); *Integration Clause*, *Black's Law Dictionary* (12th ed. 2024); *Montwood Corp. v. Hot Springs Theme Park Corp.*, 766 F.2d 359, 362 (8th Cir. 1985) (defining merger clause). But parol evidence nevertheless is admissible if any exception to the parol evidence rule applies, such as the ambiguity or conditions precedent exceptions. *See Sturzenbecher v. Sioux Cnty. Ranch, LLC*, 20 N.W.3d 419, 426–27 (S.D. 2025) (discussing generally parol evidence rule and exceptions); *Mueller v. Hubbard Milling Co.*, 573 F.2d 1029, 1035–36 (8th Cir. 1978) (same). In this case, both the ambiguity and conditions precedent exceptions apply, so the SPA's merger clause does not preclude the admission of parol evidence to explain its terms.

In summary, because (1) the SPA ambiguously describes the preconditions to its closing, (2) the conditions precedent exception applies, and (3) the merger clause does not preclude the admission of parol evidence, the bankruptcy court did not err when it admitted and considered parol evidence of the SPA's terms.

### 2. Federal Rule of Evidence 408 did not bar admission of Dandurand's prepetition settlement offer, but this error does not require reversal.

Next, in analyzing Kanyon's motion for relief from the automatic stay, the bankruptcy court discussed Dandurand's prepetition settlement offer to Kanyon, characterized that offer as inadmissible under Federal Rule of Evidence 408, and declined to give it any weight.[83] Kanyon argues that the bankruptcy court committed reversible error by declining to admit evidence of the settlement offer to demonstrate Dandurand's bad faith. Though we agree that the bankruptcy court erred in describing the settlement offer as inadmissible, that error does not require reversal.

Federal Rule of Evidence 408 prohibits the admission of settlement offers "to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a).

---

[83]Op. 7–8, 19 n.10.

But "[t]he court may admit this evidence for another purpose," *id.* 408(b), such as "to show a party's lack of good faith." *Weems v. Tyson Foods, Inc.*, 665 F.3d 958, 966 (8th Cir. 2011) (citing *Athey v. Farmers Ins. Exch.*, 234 F.3d 357, 361–62 (8th Cir. 2000)).

Applying this authority, we conclude Dandurand's settlement offer was admissible. Kanyon argues that it offered the evidence to attempt to prove Dandurand's alleged bad-faith motive for filing his chapter 11 petition, not to prove or disprove the validity or amount of the claim Dandurand offered to settle.[84] Because Federal Rule of Evidence 408 permits admission of a settlement offer for that evidentiary purpose, the bankruptcy court erred in characterizing the settlement offer as inadmissible.

This error, however, does not require reversal. The record shows that the parties stipulated to the settlement offer's admission at trial, and that the bankruptcy court in fact admitted the offer into evidence.[85] Rather than excluding the offer from evidence, the court simply did not "give weight to [the settlement] discussions."[86]

Determinations about evidentiary weight are factual findings that appellate courts review under Federal Rule of Civil Procedure 52(a)(6)'s "clearly erroneous" standard. *See Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 855 (1982). Reversing a finding about evidentiary weight requires us to conclude that the trial court was "more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Papio Keno Club, Inc. v. City of Papillion (In re Papio Keno Club, Inc.)*, 262 F.3d 725, 729 (8th Cir. 2001) (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)). Moreover, a reviewing court may correct a factual finding premised on a legal error. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501

---

[84]Appellant's Principal Br. 62.

[85]Hr'g Tr. 8:2–11.

[86]Op. 8.

(1984). So long as we defer to the trial court's findings concerning credibility, we "may independently review the entire record to the degree necessary to correct legal error." *Leonard v. Dorsey & Whitney LLP*, 553 F.3d 609, 613 (8th Cir. 2009) (citing *Bose Corp.*, 466 U.S. at 499–501).

Here, the bankruptcy court's treatment of the settlement offer concerns the evidence's weight and constitutes a factual finding premised on a misunderstanding of the law. Thus, we may review the entire trial record. On review of that entire record, the bankruptcy court's finding[87] certainly does not "strike [us] as wrong with the force of a five-week-old unrefrigerated dead fish." *In re Papio Keno Club, Inc.*, 262 F.3d at 729. Giving appropriate weight to Dandurand's settlement offer as well as the substantial weight of the other evidence in the record, and for the reasons explained more thoroughly in our discussion below,[88] we conclude that the settlement offer neither proves bad faith nor outweighs the evidence of Dandurand's good faith motive to file for bankruptcy protection. Because the record as a whole supports upholding the bankruptcy court's determination that Dandurand filed his bankruptcy case in good faith and with valid bankruptcy purposes, we decline to reverse on this basis.

## B. The bankruptcy court did not err in granting Dandurand's motion to reject the SPA.

Kanyon next challenges the bankruptcy court's decision to grant Dandurand's motion to reject the SPA as an executory contract. For the following reasons, we affirm.

Section 365(a) of the Bankruptcy Code entitles a debtor to assume or reject an executory contract. 11 U.S.C. § 365(a). Generally, courts have discretion to approve a debtor's election so long as (1) the contract is executory, and (2) the

---

[87]Op. 8–10, 19–20 (discussing Dandurand's financial condition, snowballing borrowing, desire to reject the executory contract, and other valid bankruptcy motives).

[88]*See* discussion *infra* Sections II.B.2, II.C.1.a.

debtor's choice reflects a valid exercise of the debtor's business judgment. *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 522–23 (1984). Section 365(g) of the Bankruptcy Code provides that a debtor's approved contract rejection operates as a breach of the contract, effective immediately prepetition, and the counterparty to the rejected contract may assert a claim against the bankruptcy estate for rejection damages within such time as the court directs. 11 U.S.C. §§ 365(g), 502(g)(1); Fed. R. Bankr. P. 3002(c)(4), 3003(c)(3); *Lewis Bros. Bakeries, Inc. v. Interstate Brands Corp. (In re Interstate Bakeries Corp.)*, 751 F.3d 955, 961 (8th Cir. 2014) (stating that rejection "convert[s] the debtor's unfulfilled obligations to damages").

Kanyon contends that the bankruptcy court wrongly decided both prongs of the contract rejection framework, arguing (1) the SPA was not executory and (2) Dandurand's decision to reject it was in bad faith and, thus, was not a valid exercise of his business judgment. On appeal, "[w]e review the bankruptcy court's conclusions of law de novo and its findings of fact for clear error." *Crystalin, L.L.C. v. Selma Props., Inc. (In re Crystalin, L.L.C.)*, 293 B.R. 455, 463 (B.A.P. 8th Cir. 2003) (citing *Tax 58 v. Froehle (In re Froehle)*, 286 B.R. 94, 97 (B.A.P. 8th Cir. 2002)). Contract construction presents a legal question that appellate courts typically review de novo. *See Ark. Rice Growers Coop. Ass'n v. Alchemy Indus., Inc.*, 797 F.2d 565, 567 (8th Cir. 1986) (reviewing district court decision). To the extent the bankruptcy court based its interpretation on extrinsic evidence, however, that interpretation is factual in nature, and we review it for clear error. *Id.*; *Granite Reinsurance Co. v. Acceptance Ins. Cos. (In re Acceptance Ins. Cos.)*, 383 B.R. 128, 135 (B.A.P. 8th Cir. 2008).

We review each prong of the executory contract framework in turn.

### 1. The SPA was executory.

"The Code does not define the term 'executory contract.'" *Cameron v. Pfaff Plumbing & Heating, Inc.*, 966 F.2d 414, 416 (8th Cir. 1992). But the Supreme Court has defined the term as "a contract that neither party has finished performing." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 372 (2019). To

satisfy this standard, "*both* parties [must] have so far underperformed that a failure of *either* to complete performance would constitute a material breach excusing the performance of the other." *In re Interstate Bakeries Corp.*, 751 F.3d at 963 (citing *Kaler v. Craig (In re Craig)*, 144 F.3d 593, 596 (8th Cir. 1998)); *see also FDJ, LLC v. Determan*, 10 N.W.3d 220, 224–25 (S.D. 2024) (discussing material breach). A material breach goes "to the root or essence of the contract," *In re Interstate Bakeries Corp.*, 751 F.3d at 962–63 (quoting 15 Richard A. Lord, *Williston on Contracts* § 44:55 (4th ed. 2000)), or "would 'defeat the very object of the contract.'" *FDJ, LLC,* 10 N.W.3d at 225 (internal quotation marks omitted) (quoting *Icehouse, Inc. v. Geissler*, 636 N.W.2d 459, 465 (S.D. 2001)). Courts generally consider a stock sale contract executory when the seller has not surrendered the stock and the purchase price remains unpaid. *See, e.g.*, *Wallach v. Smith (In re NanoDynamics, Inc.)*, 735 F. App'x 762, 764 (2d Cir. 2018) ("Default on an obligation to make substantial monetary payments in exchange for shares is a material breach that renders a contract executory."); *Johnson v. Fairco Corp.*, 61 B.R. 317, 319 (N.D. Ill. 1986) (finding a stock repurchase agreement executory when the debtor had not paid to repurchase the shares and the shares had not been returned to the debtor).

The parties agree that the SPA was executory as to Dandurand,[89] but their positions diverge as to Kanyon's outstanding obligations. Dandurand argues Kanyon owed several outstanding obligations. Kanyon argues it owed none. The bankruptcy court sided with Dandurand, determining in relevant part that Kanyon failed to substantially perform conditions to closing by both refusing to pay

---

[89]Appellant's Principal Br. 46 ("[A]s of the petition date, the only performance remaining under the SPA was on Debtor's side."); Appellee's Principal Br. 25 ("The lower court properly found that the Contract was executory because there were unperformed duties on both sides.").

consideration in excess of $1.00 for Dandurand's shares and circumventing its obligation to provide a financing plan.[90]

First, the bankruptcy court did not clearly err in determining that Kanyon owed material unfulfilled obligations to provide consideration for the transaction by paying DSF's vendors, and that those obligations were conditions to closing. At trial, Dandurand introduced evidence establishing that Kanyon agreed to purchase DSF through injection of capital that would save DSF from the brink of financial collapse,[91] payment of $1.00, and satisfaction of other debts—including assistance paying DSF's debt to its sunflower seed supplier, Advanced Sunflower, and other vendors.[92] As part of his testimony in support of his version of events, Dandurand testified that the parties had multiple phone calls immediately before Dandurand signed the SPA, during which Smith "made several commitments to [Dandurand]" concerning DSF's debts to its vendors,[93] including "commitments that were verbally made . . . [w]ith Advanced Sunflower."[94] Dandurand bolsters this testimony with evidence that, when Smith allegedly expressed some postexecution opposition to Kanyon's immediate payment of DSF's debts to Advanced Sunflower,[95] Dandurand responded via email that the parties' agreement rested upon Kanyon "work[ing] out a plan"[96] with Advanced Sunflower. Kanyon's allegations in the state-court

---

[90]For the reasons explained in Section II.A.1. above, though these purported conditions are not evident on the SPA's face, the bankruptcy court had authority to consider evidence of them under multiple exceptions to the parol evidence rule.

[91]Hr'g Tr. 69:17–24.

[92]Hr'g Tr. 74:14–21, 77:14–78:3, 78:17–18, 86:1–9, 105:19–23.

[93]Hr'g Tr. 69:8–16, 77:12–78:3.

[94]Hr'g Tr. 86:1–9.

[95]Hr'g Tr. 81:5–82:12, 163:16–164:24.

[96]Apr. 24 Email String, at 3.

-27-

litigation[97] and arguments on appeal also bolster Dandurand's position. The record is replete with Kanyon's admissions that the SPA "gives Kanyon the right to purchase 90% of DSF for $1.00 in exchange for assuming DSF's liabilities *and recapitalizing the business*."[98] Despite these admissions, Kanyon contends that the SPA requires it to do nothing except pay $1.00, and that any purported agreements Kanyon made to pay DSF's suppliers were incidental to Kanyon's anticipated co-ownership of DSF, not conditions that would relieve Dandurand of his obligation to sell the majority of his shares in DSF or give rise to a material breach of the SPA.[99] The bankruptcy court expressly found Dandurand more credible on this point and determined Kanyon's promise to pay DSF's vendors was an unfulfilled condition to closing.[100] Because this obligation would provide a motive and meaningful consideration for Dandurand's agreement to the SPA, as opposed to a pro forma recitation of Kanyon's obligation to pay $1.00, we agree that this condition went to the essence of the SPA, and that it was a materially unperformed obligation.

Second, the bankruptcy court did not clearly err in finding that Kanyon's provision of a financing plan was a material unperformed condition to closing. Section 6.01 of the SPA, titled "Conditions to Obligations of Buyer," premises Kanyon's obligation to consummate the transaction on Dandurand's fulfillment of

---

[97]State Ct. Compl., at 6 ("Pursuant to Section 6.01(h) of the SPA, Kanyon Holdings agreed to formulate a financing plan for DSF.").

[98]Appellant's Mem. Opp'n Debtor's Mot. Dismiss Appeal 7 (emphasis added). *See also* Appellant's Reply Br. 2 ("Once Kanyon had control of DSF, it intended to provide additional capital and management expertise that DSF desperately needed."), 23 ("[A]llowing Kanyon to close the transaction and recapitalize DSF would directly benefit [Dandurand's] Estate . . . ."), 32 ("The infusion of capital and new management that Kanyon promised was precisely what DSF needed.").

[99]Hr'g Tr. 164:3–9.

[100]Op. 14–16.

several conditions or anyon's waiver.[101]  Among other things, subsection (h) of Section 6.01 of the SPA relieves Kanyon of its obligation to close if Kanyon is not "satisfied that its financing plan for [DSF] is executable."[102]  Extracontractual evidence supports the bankruptcy court's conclusion that Kanyon agreed to provide a financing plan as a condition to Dandurand's performance obligation.  For example, Kanyon and Dandurand appear to agree that one of Kanyon's roles under the SPA was to serve as an investment partner that would increase DSF's value.[103] That role is consistent with Kanyon's obligation to inform Dandurand of its plan to rehabilitate DSF before Dandurand transferred his interest.  And Kanyon's position in state court also is consistent with that obligation.  In its state court complaint, Kanyon alleges that, "Pursuant to 6.01(h) of the SPA, Kanyon Holdings agreed to formulate a financing plan for DSF."[104]  Similarly, in response to a question asking whether he remembered that "in order to close . . . Black Kanyon would have a financing plan in place," Smith testified that he "recall[ed] something like that."[105] Smith further conceded that Kanyon had not formulated a financing plan by the time Kanyon waived the conditions to closing and set a closing date because Kanyon "got hit with resistance" from Dandurand.[106]  This collective evidence supports the bankruptcy court's determination that Kanyon owed Dandurand a material preclosing obligation to formulate a financing plan.  Giving appropriate deference

---

[101]Stock Purchase Agreement, at 18.

[102]Stock Purchase Agreement, at 19.

[103]*See, e.g.*, Hr'g Tr. 19:10–12, 161:15–18 ("[W]e basically were offering that [Dandurand would retain a 10% interest in DSF] so that we'd have aligned interests which is Dakota Style and grow the value of the company and he could sell that, those shares to us at a later date when the company had more value.").

[104]State Ct. Compl., at 6.

[105]Hr'g Tr. 179:9–14.

[106]Hr'g Tr. 180:3–5.

to the bankruptcy court's interpretation of that evidence, we cannot conclude that the bankruptcy court committed clear error.

Because the bankruptcy court did not clearly err in determining Kanyon owed Dandurand material obligations under the SPA, and the parties agree Dandurand owed material obligations under that agreement, the record supports the bankruptcy court's conclusion that the SPA was an executory contract.

### 2. Rejection was a proper exercise of Dandurand's business judgment.

If a court determines a contract is executory, it must then determine whether the debtor's decision to assume or reject the contract represents a proper exercise of the debtor's business judgment. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523–26 (1984) (analyzing whether circumstances justified departure from the usual business judgment rule). The so-called "business judgment rule" sets a deferential standard, and bankruptcy courts ordinarily approve the debtor's choice. *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 374 (2019).

"[T]he business judgment test consists of two parts." *Crystalin, L.L.C. v. Selma Props., Inc. (In re Crystalin, L.L.C.)*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003). First, the decision to assume or reject a contract must reflect an exercise of the debtor's sound business judgment, meaning the decision must benefit the estate and be in the estate's best interest. *Id.*; *see also Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n.16 (8th Cir. 1997) (drawing analogy to business judgment test under executory contract framework). Second, the bankruptcy court must analyze whether it should nonetheless "interfere with the [debtor's] business judgment" because the debtor acted in bad faith or grossly abused its business discretion. *In re Crystalin, L.L.C.*, 293 B.R. at 464 (citing *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985)); *see also In re Food Barn Stores, Inc.*, 107 F.3d at 567 n.16 (explaining that courts should not interfere if the debtor's choice would enhance the estate and the "request is not manifestly unreasonable or made in bad faith").

Here, the bankruptcy court did not err in determining rejection was a valid exercise of Dandurand's sound business judgment. The record clearly establishes that DSF had been profitable in the past,[107] that Dandurand's dispute with Kanyon was "handcuffing" DSF by restraining growth,[108] and that DSF's finances were improving.[109] The record also supports the conclusion that rejecting the SPA benefitted Dandurand's bankruptcy estate by permitting Dandurand's continued work for DSF and preserving his ability to receive income from DSF to fund payments to creditors under the now-confirmed plan.[110] Though Kanyon argues that enforcing the SPA would not necessarily result in Dandurand's immediate termination from DSF, the record supports a contrary inference. Specifically, Dandurand's agreement under the SPA not to compete with Kanyon for two years following closing[111]—rather than for two years following Dandurand's hypothetical future termination, and the parties' history of contentious litigation supports the bankruptcy court's inference that enforcing the SPA would jeopardize Dandurand's employment. Dandurand's interest in receiving income[112] from employment at DSF, retaining the possibility of future profits from DSF, and using rejection to prevent ongoing litigation over the SPA supply meaningful benefits to the estate. Thus, the record supports the bankruptcy court's conclusion that Dandurand satisfied the first part of the business judgment test.

---

[107]Hr'g Tr. 53:10–20 (discussing DSF's growth).

[108]Hr'g Tr. 93:21–94:8 (discussing effect of lawsuit on ability to take on new customers).

[109]Hr'g Tr. 92:22–25 ("It was profitable last year for the first time in four years.").

[110]Hr'g Tr. 98:5–16.

[111]Stock Purchase Agreement, at 16–17.

[112]Hr'g Tr. 97:23–98:20.

The record also supports the conclusion that Dandurand satisfied the second part of the business judgment test: that the circumstances of this case did not require the bankruptcy court to interfere with Dandurand's business judgment. Kanyon argues that Dandurand lacked good faith in electing to file bankruptcy because he sought bankruptcy relief to reject the SPA and reduce litigation costs. But the record reflects that Dandurand also sought bankruptcy relief for multiple additional legitimate reasons. For example, his personal financial burden was growing,[113] he had become engulfed in the financial "quicksand" of "borrowing credit to pay credit,"[114] he had taken out a sizeable personal loan to pay company debt,[115] and he had been paying only the minimum balances due on his personal credit cards,[116] despite believing that "[n]othing [is] worse than carrying credit card debt."[117] He also testified that DSF's financial struggles strained his personal income: he cut his salary in half beginning in June 2023,[118] and he periodically deferred or forfeited paychecks "depending on the position of the company."[119] The bankruptcy court determined Dandurand's desire to escape his financial quicksand served a valid bankruptcy purpose, and we agree. Consequently, we also agree with the bankruptcy court's decision not to interfere with Dandurand's business judgment.

Because the bankruptcy court did not err in permitting Dandurand to reject the SPA, we affirm.

---

[113]Hr'g Tr. 24:22.

[114]Hr'g Tr. 24:22–25.

[115]Hr'g Tr. 36:16–25.

[116]Hr'g Tr. 92:10–21.

[117]Hr'g Tr. 92:2–3.

[118]Hr'g Tr. 41:6–20.

[119]Hr'g Tr. 40:4–17, 46:6–7 ("I haven't paid myself since December 6th.").

**C.** **The bankruptcy court did not err in denying Kanyon's motion for relief from the automatic stay.**

We also affirm the bankruptcy court's decision to deny Kanyon stay relief.

Section 362 of the Bankruptcy Code governs the automatic stay and requests for relief from its prohibitions. Under that statute, the filing of a bankruptcy petition "operates as a stay" of nearly all collection activity, including by staying prebankruptcy judicial proceedings and acts to exercise control over property of the bankruptcy estate. 11 U.S.C. § 362(a)(1), (3). A creditor, however, may seek "relief" from the automatic stay to pursue prebankruptcy litigation and exercise its nonbankruptcy rights with respect to bankruptcy estate property. *Id.* § 362(d). Among other grounds for stay relief, a court may terminate the stay (1) "for cause," or (2) because "the debtor does not have [] equity in [] property" the creditor wishes to pursue and "such property is not necessary to an effective reorganization." *Id.* § 362(d)(1)–(2). A creditor seeking stay relief bears the burden to establish that the debtor lacks equity in property,[120] but the debtor "has the burden of proof on all other issues." *Id.* § 362(g).

Kanyon sought, and the bankruptcy court denied,[121] stay relief on both grounds. We review these decisions for an abuse of discretion, reversing only if the

---

[120]Kanyon argues *Minn-Kota Farm Agency, Inc. v. Home Fed. Sav. & Loan Ass'n*, 978 F.2d 1264 (8th Cir. 1992) (unpublished table decision) requires it to make only a prima facie showing that Dandurand lacked equity. But *Minn-Kota* does not bear on a movant's burden to prove lack of equity. The *Minn-Kota* court analyzed whether lack of adequate protection provided "cause" to grant stay relief under § 362(d)(1). Authority requiring only a prima facie showing of lack of adequate protection to obtain stay relief under § 362(d)(1) does not provide a sufficient basis to disregard § 362(g)'s clear language that the party requesting stay relief bears the burden to prove lack of equity. Thus, Kanyon bore the burden of proof on this issue, not just the burden to make a prima facie showing.

[121]The bankruptcy court denied Kanyon's motion for relief from the automatic stay both as moot and as substantively without merit. In denying the motion as moot, the bankruptcy court determined that contract rejection left the parties with nothing

-33-

bankruptcy court made clearly erroneous factual findings or erroneous legal conclusions. *Hartford Accident & Indem. Co. v. Cap. Credit Union (In re Pro-Mark Servs., Inc.)*, 673 B.R. 565, 570 (B.A.P. 8th Cir. 2025), *reh'g denied*, No. 24-6008, 2025 WL 3121635 (B.A.P. 8th Cir. Nov. 6, 2025) (citing *Gess v. Randolph Brooks Fed. Credit Union (In re Gess)*, 526 B.R. 798, 800 (B.A.P. 8th Cir. 2015)). For the following reasons, we affirm.

### 1. The bankruptcy court did not abuse its discretion in declining to grant Kanyon stay relief "for cause."

Section 362(d)(1) requires that bankruptcy courts grant stay relief "for cause." 11 U.S.C. § 362(d)(1). The Bankruptcy Code specifies only one "cause" for granting stay relief: lack of adequate protection. *Id.* But courts agree that a variety of other bases may provide "cause" under § 362(d)(1). *See, e.g.*, *In re Pro-Mark Servs., Inc.*, 673 B.R. at 570 ("[C]ourts have found 'cause' in a variety of circumstances.").

Here, Kanyon asserts two "causes" for stay relief under § 362(d)(1): (1) Dandurand sought bankruptcy relief in bad faith, and (2) the factors governing stay relief to litigate in a nonbankruptcy forum weigh in favor of stay relief.

### a. Bad Faith

Kanyon's first ground for stay relief raises an issue the Eighth Circuit has not yet decided: may circumstances evidencing bad faith provide "cause" for stay relief?

---

to litigate except damages that the bankruptcy court subsequently could determine. Though we agree that Dandurand's rejection of the SPA obviates the need for the parties to return to state court to litigate Kanyon's request for specific performance, we do not go so far as to agree that contract rejection deprives Kanyon of any "legal cognizable interest" in returning to state court. *See Alvarez v. Smith*, 558 U.S. 87, 92–93 (2009) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980)) (determining defendant's criminal conviction mooted his request for pretrial bail). Consequently, rather than assessing the mootness of Kanyon's motion for relief from the automatic stay, we analyze the effect of contract rejection as an aspect of our inquiry into whether Kanyon has a colorable claim to the DSF shares under § 362(d)(2).

Though we answer this question affirmatively, we conclude that the bankruptcy court did not err in deciding Dandurand did not act in bad faith.

We begin by determining that, in appropriate circumstances, a bad faith filing may justify relief from the automatic stay. Courts outside the Eighth Circuit have held that a debtor's bad faith may constitute "cause" for stay relief. *See, e.g.*, *Herlihy v. DBMP, LLC*, 167 F.4th 142, 151 (4th Cir. 2026); *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 n.2 (5th Cir. 1986) (collecting cases holding that lack of good faith provides cause for stay relief); *accord Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 25 (2000) (stating in dicta that lack of good faith would provide cause to grant stay relief). This conclusion is consistent with Eighth Circuit and Eighth Circuit Bankruptcy Appellate Panel authority concluding in analogous contexts that a debtor's bad-faith conduct may provide cause to dismiss a case. *See, e.g.*, *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.)*, 235 F.3d 375, 381 (8th Cir. 2000) ("[A] Chapter 11 petition may be dismissed for bad faith alone . . . ."); *Lariat Cos. v. Wigley (In re Wigley)*, 557 B.R. 671, 675 (B.A.P. 8th Cir. 2016) (upholding lower court "determinations that the filing served a valid bankruptcy purpose and was not filed merely to obtain a litigation advantage"). *But see Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829, 832 (8th Cir. 1994) (concluding that a more forgiving standard would apply in a chapter 7 case but nonetheless implying that using bankruptcy as a litigation tactic would be cause for dismissal even in chapter 7).

In those analogous contexts, courts in the Eighth Circuit apply a totality of the circumstances test. *In re Cedar Shore Resort, Inc.*, 235 F.3d at 379. Circumstances relevant to the bad faith inquiry include the debtor's motives for seeking bankruptcy relief, such as whether the debtor filed merely to thwart nonbankruptcy litigation or to manipulate the bankruptcy process; the debtor's financial condition; and the debtor's conduct, candor, and honesty in bankruptcy. *See, e.g.*, *id.* at 381 (concluding bankruptcy court did not abuse its discretion in finding bad faith where the primary purpose of the chapter 11 case was foiling nonbankruptcy litigation, not reorganizing); *Marshall v. McCarty (In re Marshall)*, 407 B.R. 359, 362 (B.A.P. 8th Cir. 2009) (listing circumstances relevant to bad faith inquiry); *Steiner v. Wilmington*

-35-

*Sav. Fund Soc'y (In re Steiner)*, 613 B.R. 176, 178 (B.A.P. 8th Cir. 2020) (explaining that "a debtor's 'atypical' conduct and any attempt to manipulate or abuse the bankruptcy process are both relevant" to the totality of the circumstances inquiry) (citing *Marrama v. Citizens Bank,* 549 U.S. 365, 382 (2007) (Alito, J., dissenting)). Accordingly, we also analyze the totality of the circumstances here.

In its decision, the bankruptcy court determined cause did not exist to grant stay relief because Dandurand did not engage in misconduct by filing his bankruptcy petition.[122] The bankruptcy court cited evidence that Dandurand had contemplated filing bankruptcy "for some time," and that he had a valid bankruptcy purpose for filing because "his financial burdens were increasing, [and he] was borrowing money to pay debts."[123] The court made similar, but more detailed, findings in the portion of its opinion denying Kanyon's motion to dismiss Dandurand's case for bad faith, including that Dandurand reduced his salary and that DSF's business setbacks caused "a domino effect of financial distress that [Dandurand] had not been able to fully recover from."[124] Ultimately, the court determined that Dandurand's valid bankruptcy purposes, poor finances, and general good faith participation in his

---

[122]Op. 19–20.

[123]Op. 20.

[124]Op. 8–9 ("[Dandurand] took out at least one substantial personal loan . . . to pay down the business debts of DSF and his personal credit card debts. . . . [Dandurand] testified he had considered filing bankruptcy 18 months prior and consulted with a bankruptcy attorney in June of 2023 . . . . DSF has been struggling since the fire in 2016 and the listeria recall which created a domino effect of financial distress that [Dandurand] has not been able to fully recover from. [Dandurand] further stated he filed bankruptcy to stop the state-court litigation and bring a motion to reject his contract with Kanyon, but also because the financial burden was growing, and he was borrowing to pay debts. . . . [Dandurand's] salary was reduced . . . . [And he] was pursuing many avenues to avoid filing bankruptcy some time prior to actually filing.").

bankruptcy case[125] defeated Kanyon's argument that Dandurand filed bankruptcy in bad faith solely to stop the litigation with Kanyon.[126]

The bankruptcy court did not abuse its discretion. Ample evidence supports the bankruptcy court's determinations that Dandurand filed for valid bankruptcy purposes and that DSF's financial troubles affected Dandurand's personal finances. Dandurand testified that he filed for "a number of financial reasons."[127] He outlined DSF's financial difficulties[128] and explained that he owed significant personal guarantees of DSF debt that his proposed chapter 11 plan addressed.[129] As we previously discussed,[130] Dandurand compared his financial circumstances to "quicksand," explaining that his "financial burden was growing"[131] because he was

---

[125]Op. 8–10.

[126]Op. 7.

[127]Hr'g Tr. 24:24–25.

[128]Hr'g Tr. 54:12–16 (describing February 2016 fire), 54:22–55:12 (describing May 2016 sunflower seed recall), 56:17–19 (describing delayed receipt of insurance proceeds), 58:6–59:7 (describing delay in getting the business back up and running), 59:10–19 (describing "tight cashflow situation" associated with regrowth), 59:20–60:3 (describing changes to Walmart policy that caused DSF to "burn[] through a line of credit pretty rapidly"), 62:10–15 (describing Advanced Sunflower's threat to discontinue supply due to high credit balance), 75:24–76:2 (describing Walmart cancellation of orders), 93:22–94:6 (describing lawsuit's negative impact on DSF's ability to borrow money and find new customers).

[129]Hr'g Tr. 32:14–17, 33:24–34:10 (agreeing that he was valuing guarantees at zero in plan); Plan as Confirmed, at 6–7 (treating debts under personal guarantees as contingent unsecured claims).

[130]*See* discussion *supra* Section II.B.2.

[131]Hr'g Tr. 24:22–23.

"borrowing credit to pay credit"[132] and was taking either a reduced salary[133] or no salary at all.[134] Even if circumventing state-court litigation and following through with the threat he made during settlement negotiations factored into Dandurand's decision to file his bankruptcy case, his financial difficulties demonstrate valid bankruptcy purposes and refute Kanyon's argument that Dandurand used bankruptcy solely to gain a tactical advantage in the state-court litigation.

Moreover, Dandurand's admission that he filed this case in part to reject the SPA[135] and to reduce litigation costs[136] is not compelling evidence of bad faith. Dandurand reasonably feared that performance under the SPA would jeopardize his employment at DSF after closing[137] in light of the SPA's noncompetition and nonsolicitation provisions effective immediately as of the closing date.[138] And Dandurand's dire financial circumstances make it especially reasonable for him to want to reduce his already substantial litigation costs. Dandurand's desire to avail himself of the statutory benefits of bankruptcy does not constitute bad faith in these circumstances.

The bankruptcy court's conclusion that Dandurand lacked bad faith was not an abuse of discretion.

---

[132]Hr'g Tr. 24:23.

[133]Hr'g Tr. 41:6–20.

[134]Hr'g Tr. 40:4–17, 46:6–7 ("I haven't paid myself since December 6th.").

[135]Hr'g Tr. 23:23–24:4, 24:16–20.

[136]Hr'g Tr. 91:1–4.

[137]Hr'g Tr. 45:10–17.

[138]Hr'g Tr. 94:16–95:1; Stock Purchase Agreement, at 16–17.

### b. Nonbankruptcy Litigation

Next, this panel must analyze whether the circumstances of the state-court litigation require stay relief for other "cause." We conclude that the bankruptcy court did not abuse its discretion in declining to grant stay relief on this ground.

Courts apply a balancing test to discern whether the circumstances surrounding nonbankruptcy litigation give rise to "cause" for stay relief. *Blan v. Nachogdoches Cnty. Hosp. (In re Blan)*, 237 B.R. 737, 739 (B.A.P. 8th Cir. 1999). The governing question is whether "the hardship to the moving party if it is not allowed to proceed in state court" outweighs "the potential prejudice to the Debtor[,] to the bankruptcy estate, and to the other creditors" if the court permits the litigation to proceed outside of bankruptcy. *Id.* Courts in the Eighth Circuit analyze the following factors: (1) judicial economy, (2) trial readiness, (3) the resolution of preliminary bankruptcy issues, (4) the creditor's chance of success on the merits, and (5) the cost of defense or other potential burden to the bankruptcy estate and the impact of the litigation on other creditors. *Id.*

The bankruptcy court determined each of these factors weighed in favor of denying stay relief, except that the fourth factor, the creditor's chance of success on the merits, was neutral.[139] Accordingly, the bankruptcy court determined the circumstances surrounding the state-court litigation did not warrant stay relief.

The bankruptcy court did not abuse its discretion in reaching that result. We agree that the first factor, judicial economy, weighs against stay relief because the Bankruptcy Code offers remedies to enable a global resolution of the parties' disputes in one forum without additional litigation. As to factor two, trial readiness of the state-court litigation, the record contains uncontroverted evidence that the state-court litigation was only thirty percent complete[140] on the petition date and

---

[139]Op. 22.

[140]Hr'g Tr. 141:2–9.

would take an additional "year and a half to get to trial."[141] The record also reflects that a return to the state court would require many depositions[142] and expert valuations,[143] resolution of discovery disputes,[144] and adjudication of summary judgment motions.[145] Thus, sufficient evidence supports the bankruptcy court's finding that the second factor weighs against stay relief because the state-court litigation was nowhere near trial ready. The third factor, the resolution of preliminary bankruptcy issues, also weighs against stay relief because Dandurand's then-proposed and now-confirmed plan provides alternatives for treating Kanyon's claim that either render portions of the state-court litigation unnecessary through contract rejection or require an avoidance action before the bankruptcy court to invalidate the SPA.[146] Because resolution of these issues obviates the need for the state-court litigation, this factor weighs in favor of denying stay relief. Next, we agree with the bankruptcy court that the record does not clearly establish whether the fourth factor, Kanyon's chance of success on the merits, weighs in favor of or against stay relief. The parties presented very little evidence establishing the viability of Kanyon's state court complaint, so the bankruptcy court did not err in declining to give this factor weight. Finally, the record supports the bankruptcy court's conclusion that the last factor, the burden on the estate and the impact of

---

[141]Hr'g Tr. 140:19–21.

[142]Hr'g Tr. 132:19–133:4 ("[T]en specific individuals were identified as potential deponents. There were some other individuals identified . . . [as] potential deponents . . . if the need for additional depositions arose.").

[143]Hr'g Tr. 139:5–8 ("I don't know how you would try this case without some expert testimony and valuation of the company. So that would have to happen, expert discovery.").

[144]Hr'g Tr. 139:2–3 ("[I]t's very, very likely we'll have discovery motions to file.").

[145]Hr'g Tr. 139:9–10.

[146]Plan as Confirmed, at 2, 7–8, 10.

litigation on creditors, weighs against stay relief. As the bankruptcy court determined, the SPA's noncompetition and nonsolicitation provisions beginning as of the closing date[147] make it "reasonable to believe Kanyon would terminate [Dandurand's] employment after this contentious fight and the noncompete clause in the [SPA] would severely restrict Dandurand's ability to obtain other employment in the near future."[148] Moreover, the uncontroverted evidence is that the state-court litigation would cost Dandurand an additional $400,000 to $500,000[149] and occupy his attention for approximately another year and a half.[150] Because the time and expense associated with the state-court litigation would be costly to the estate and detract from Dandurand's ability to pay creditors and reorganize, this factor weighs against stay relief.

In summary, the evidence, as applied to the five-part balancing test for stay relief analysis in this circuit, supports the bankruptcy court's analysis and denial of Kanyon's request for relief from the automatic stay under § 362(d)(1) for cause. Consequently, we affirm on this ground.

## 2. Contract rejection defeats Kanyon's request for stay relief with respect to property under § 362(d)(2).

Kanyon next argues that the bankruptcy court erred in denying Kanyon's motion for relief from the automatic stay under 11 U.S.C. § 362(d)(2). We disagree.

Section 362(d)(2) of the Bankruptcy Code provides that bankruptcy courts must grant relief "with respect to a stay of an act against property" if "(A) the debtor

---

[147]Stock Purchase Agreement, at 16–17.

[148]Op. 22–23.

[149]Hr'g Tr. 141:22–24.

[150]Hr'g Tr. 140:19–21.

does not have an equity in such property" and "(B) such property is not necessary to an effective reorganization."  11 U.S.C. § 362(d)(2)(A)–(B).

### a.　An act against property

This subsection, by its plain language, only applies "with respect to a stay of an act against property."  *Id.* § 362(d).  As a result, a party seeking stay relief under § 362(d)(2) must have a colorable claim against the property at issue.  *See Montgomery v. Dennis Joslin Co. II, LLC (In re Montgomery)*, 262 B.R. 772, 776 (B.A.P. 8th Cir. 2001); *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 33 (1st Cir. 1994).  The colorable claim standard "is a low threshold."  *Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC)*, 602 B.R. 798, 825 (B.A.P. 1st Cir. 2019), *aff'd*, 976 F.3d 107 (1st Cir. 2020) (quoting *In re Pansier*, No. 18-22297-beh, 2019 WL 1495100, at *4 (Bankr. E.D. Wis. Apr. 3, 2019)).  A party presents a colorable claim where there is a "reasonable likelihood that a [party] has a legitimate claim or lien as to a debtor's property," *Grella*, 42 F.3d at 33 (analyzing § 362(d)(1)), that the creditor has not clearly waived.  *See, e.g.*, *In re Old Cold, LLC*, 976 F.3d at 117 (discussing waiver).

Here, the property at issue is the DSF stock that Dandurand agreed to transfer to Kanyon under the SPA.  Because Dandurand did not actually transfer the stock to Kanyon prepetition, Kanyon only has a colorable claim to Dandurand's property if there is a reasonable likelihood that Kanyon could compel Dandurand to transfer the stock through the state-court specific performance litigation.[151]

---

[151]In response to a question raised at oral argument, Kanyon's counsel argued for the first time on appeal that Dandurand transferred his equitable interest in the DSF shares to Kanyon the moment he signed the SPA under a theory of "equitable transfer."  Though unclear, Kanyon's argument appears to implicate the doctrine of equitable conversion, an equitable remedy courts occasionally invoke, most often in the context of real estate transactions and testamentary disputes, when necessity and justice compel them to deem equitable title vested at execution.  *See, e.g.*, *Schleuter Co. v. Sevigny*, 564 N.W.2d 309, 314 (S.D. 1997) (discussing equitable conversion in real estate context); 27A Am. Jur. 2d *Equitable Conversion* § 1, 4 (explaining

Absent rejection, Kanyon's claim to the stock would pass the "colorable claim" standard's "low threshold." Kanyon's claim to the stock is premised on Kanyon's ability to compel the stock's transfer through the specific performance litigation, and the record suggests that Kanyon is reasonably likely to have a colorable claim through that litigation. Among other evidence, Dandurand testified that the state court denied Dandurand's motion to dismiss the specific performance litigation,[152] and the record shows this denial occurred after briefing by both parties.[153] Moreover, Dandurand does not meaningfully dispute that Kanyon's specific performance claim against DSF is colorable. Thus, if we had not affirmed rejection, Kanyon's asserted entitlement to specific performance of the SPA would have provided Kanyon a sufficiently colorable claim under § 362(d)(2).

Our decision affirming Dandurand's rejection of the SPA, however, drains the color from Kanyon's claim. Rejection severs any right Kanyon might have had to compel Dandurand to transfer the stock, leaving Kanyon without any assertable interest in the property that is the subject of its stay relief motion. Rejection of the SPA, therefore, makes § 362(d)(2) unavailable to Kanyon.

---

equitable conversion and its limited application). Critically, Kanyon cites no authority applying equitable conversion to stock sales, likely because "[t]he doctrine has no application to sales of personal property, such as an interest in a partnership or a limited liability company." 27A Am. Jur. 2d *Equitable Conversion* § 1. Moreover, the doctrine "is not favored in law, and . . . does not exist as a matter of right." *Id.* § 4. To the extent Kanyon premises its purported interest in the shares on the doctrine of equitable conversion, we conclude Kanyon clearly waived any claim under this theory by failing to raise it before the bankruptcy court. At a minimum, the bankruptcy court should have had the opportunity to determine whether necessity and justice demanded extension of this disfavored, equitable doctrine beyond its ordinary limits under the facts of this case.

[152]Hr'g Tr. 20:11–21:1.

[153]State Ct. Dkt. Ex. K11, at 2–3, *In re Dandurand*, No. 24-40401 (Bankr. D.S.D. Apr. 10, 2025), Dkt. No. 163.

-43-

Though the bankruptcy court concluded that rejection made stay relief unavailable to Kanyon,[154] it nonetheless analyzed the elements under both subsections of § 362(d)(2) and determined those elements favored denial of Kanyon's motion. Like the bankruptcy court, for completeness, we next proceed to those subsections. And, like the bankruptcy court, we determine § 362(d)(2)(A) and (B) do not require stay relief on this record.

### b.     The debtor's equity

The party requesting stay relief must prove that the debtor lacks equity in the property at issue to succeed under § 362(d)(2)(A). 11 U.S.C. § 362(g). To calculate equity under subsection (A) of § 362(d)(2), we compare the total value of encumbrances against the subject property with the property's fair market value. *Bowman v. Bond (In re Bowman)*, 253 B.R. 233, 238 (B.A.P. 8th Cir. 2000) (citing *Nantucket Invs. II v. Cal. Fed. Bank (In re Indian Palms Assocs.),* 61 F.3d 197, 206 (3d Cir. 1995)). When the property at issue consists of a debtor's ownership interest in a closely held company, the appropriate asset to value is the company—not necessarily its assets. *See, e.g.*, *In re Fund Raiser Prods. Co.,* 163 B.R. 744, 750–51 (Bankr. E.D. Pa. 1994) (listing factors relevant to valuation of closely held company and determining offer to repurchase shares was best evidence of value). Trial courts have broad discretion in determining a company's value under the unique context of each case; "any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court'" may suffice. *Swope v. Siegel-Robert, Inc.*, 243 F.3d 486, 494 (8th Cir. 2001) (quoting *Weinberger v. UOP, Inc.,* 457 A.2d 701, 713 (Del. 1983)) (giving district court discretion in valuing a company in the context of a shareholder action); *see also Est. of Berg v. Comm'r*, 976 F.2d 1163, 1165 (8th Cir. 1992) (reviewing whether tax court's determination of value was clearly erroneous); *cf. In re Partners in Hope,*

---

[154]Op. 18 ("Based upon the Court granting [Dandurand's] motion to reject the SPA with Kanyon, the only remaining issue between [Dandurand] and Kanyon is the determination of damages resulting from rejection of the SPA. Therefore, the Court finds Kanyon's request for relief from the automatic stay moot . . . .").

*Inc.*, 660 B.R. 366, 377 (Bankr. D.S.C. 2024) (noting that "[v]aluation [under § 362(d)(2)] is not an exact science").

The bankruptcy court concluded that Kanyon did not satisfy its burden of proof as to Dandurand's equity in DSF under § 362(d)(2)(A) and that there was actual value in the DSF shares.[155] We agree.

Very little evidence supports Kanyon's contention that Dandurand's interest in DSF is worthless. Dandurand's decision to assign his interest in DSF a $0 "book value"[156] as of the petition date in his chapter 11 case does not satisfy Kanyon's burden because Dandurand's rejection of the SPA makes DSF more valuable to Dandurand postpetition. Moreover, the evidence supports the bankruptcy court's conclusion that Dandurand's interest in DSF has value. There does not appear to be any dispute that Dandurand's interest is unencumbered. As to the value of Dandurand's shares, Dandurand testified that he originally offered to sell 90% of his interest in DSF to Kanyon for $1.7 million,[157] and that he signed the SPA under the impression that Kanyon would not only pay him $1.00, but also pay significant debts owed to DSF vendors[158] and provide "management and business expertise."[159] There was testimony suggesting DSF owns valuable assets, including that DSF may have "recall insurance of $2 million,"[160] and that DSF's option to purchase[161] the

---

[155]Op. 23–24.

[156]Hr'g Tr. 42:5–11.

[157]Hr'g Tr. 67:15–19.

[158]Hr'g Tr. 74:14–21.

[159]Hr'g Tr. 170:11–13.

[160]Hr'g Tr. 85:10–12.

[161]Hr'g Tr. 119:15–18.

real estate where its manufacturing plants are located[162] could generate significant value.[163] Lacking persuasive contrary evidence, the bankruptcy court did not clearly err in concluding that Kanyon failed to satisfy its burden to prove lack of equity.

### c. Necessity to an effective reorganization

The final inquiry under § 362(d)(2)(B) is whether the property is "not necessary to an effective reorganization." To rebut this element, the debtor must establish both that the property is necessary, and that the debtor has "a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376 (1988) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.)*, 808 F.2d 363, 370 (5th Cir. 1987) (en banc)). An asset may be necessary when it is key to the debtor's business income. *See, e.g.*, *In re Jonesboro Tractor Sales, Inc.*, 619 B.R. 223, 236 (Bankr. E.D. Ark. 2020) (determining assumable executory contract to continue selling counterparty's products was necessary to dealership's effective reorganization). And a debtor has a reasonable prospect of reorganization within a reasonable time if the "things which are to be done after confirmation can be done as a practical matter under the facts." *Bowman v. Bond (In re Bowman)*, 253 B.R. 233, 238–39 (B.A.P. 8th Cir. 2000) (quoting *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson),* 767 F.2d 417, 420 (8th Cir. 1985)).

The bankruptcy court did not err in concluding that Dandurand proved his shares in, and continued control of, DSF were necessary to his effective reorganization under § 362(d)(2)(B). First, the evidence supports the conclusion that the shares were necessary. Dandurand testified that he needs the income from DSF

---

[162]Hr'g Tr. 64:7–21.

[163]Hr'g Tr. 161:2–162:17 (discussing perceived value in "real estate . . . where they could . . . buy out the option to purchase the real estate" and concluding that the real estate was "worth maybe twice as much as the buyout was for [] the real estate").

to make his plan payments and to pay for his future needs,[164] and that he feared that the forced transfer of his controlling interest in DSF would jeopardize his employment.[165] In light of the SPA's noncompetition and nonsolicitation provisions beginning immediately at closing,[166] Dandurand's advanced age,[167] and the parties' history of litigation, it was not clearly erroneous for the bankruptcy court to conclude that retaining a controlling interest in DSF was necessary to Dandurand's successful reorganization under chapter 11. Second, the court properly determined that there was a reasonable prospect of reorganization within a reasonable time. Dandurand timely filed his now-confirmed plan;[168] and Dandurand's "monthly operating reports demonstrate[d] his cash activity [was] increasing each month, and his actual net cash flow [was] increasing and ha[d] been positive each month since filing."[169] Thus, the

---

[164]Hr'g Tr. 98:5–20.

[165]Hr'g Tr. 45:10–17.

[166]Hr'g Tr. 94:16–95:1; Stock Purchase Agreement, at 16–17.

[167]Hr'g Tr. 49:2 ("I graduated Ron Calley High School in 1973 . . . ."), 94:19–21 ("I have great experience. My problem is I'm old.").

[168]Mar. 2025 Plan (displaying filing date within 90 days of petition date).

[169]Op. 24–25; Monthly Operating Report Small Business Chapter 11, *In re Dandurand*, No. 24-40401 (Feb. 18, 2025), Dkt. No. 125 (showing -$7,541.03 net cash flow for the period beginning December 9, 2024, and ending December 31, 2024); Monthly Operating Report Small Business Chapter 11, *In re Dandurand*, No. 24-40401 (Feb. 19, 2025), Dkt. No. 129 (showing $970.14 net cash flow during January 2025); Monthly Operating Report Small Business Chapter 11, *In re Dandurand*, No. 24-40401 (Mar. 20, 2025), Dkt. No. 147 (showing $3,240.18 net cash flow during February 2025); Monthly Operating Report Small Business Chapter 11, *In re Dandurand*, No. 24-40401 (Apr. 21, 2025), Dkt. No. 177 (showing $2,264.78 net cash flow during March 2025). The parties did not designate Dandurand's monthly operating reports as part of the record on appeal, but the bankruptcy court relied on them in making its decision. Consequently, we order them included in the record under Rule 8009(a)(4).

evidence supports the bankruptcy court's determination that Dandurand's interest in DSF is necessary to his effective reorganization.

Because the bankruptcy court's denial of Kanyon's motion for relief from the automatic stay under § 362(d)(2) was not an abuse of discretion, we affirm on this ground.

## CONCLUSION

For the reasons stated, we DENY Dandurand's motion to dismiss and AFFIRM the bankruptcy court's decision on the merits.

_____